IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL HARPER, B03541, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 25 C 11096 |
| | ) | |
| BRITTANY GREENE, Warden, | ) | |
| Western Illinois Correctional Center,[1] | ) | The Honorable |
| | ) | John Robert Blakey, |
| Respondent. | ) | Judge Presiding |

**MOTION TO DISMISS SUCCESSIVE HABEAS PETITION**

Pursuant to 28 U.S.C. § 2244(b)(2)(B), Habeas Corpus Rule 4, and this Court's order, Doc. 19, respondent moves to dismiss petitioner's successive 28 U.S.C. § 2254 habeas petition with prejudice, Doc. 9.

**BACKGROUND**

**I. Petitioner Is Convicted of Arson and Two Counts of First Degree Murder, and His Convictions Are Affirmed on Appeal.**

In April 1990, following simultaneous but severed jury trials, petitioner and his codefendant Arthur Brown were found guilty of two counts of first degree murder and one count of arson for setting fire to a video store (Magic Video), thereby causing the deaths of two people in a neighboring restaurant. *See* Exh. 1 (*People v. Harper*, 2017 WL 2111558, 2017 IL App (1st) 152867-U), ¶ 3; *see also People v. Brown*, 624 N.E.2d 1378, 1382 (Ill. App. Ct. 1993) (consolidated direct

---

[1] Justin Maher is petitioner's custodian and the current Warden at the Western Illinois Correctional Center and should be substituted as respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004); Fed. R. Civ. P. 25(d); Habeas Rule 2(a).

appeal, Nos. 1-90-1612 & 1-91-1524); *People v. Harper*, 665 N.E.2d 474, 478 (Ill. App. Ct. 1996) (retrial direct appeal). At trial, the State presented evidence that a bystander witnessed two men — one carrying a can of gasoline — exit a vehicle parked in front of Magic Video and approach the store; a few minutes later, the store was on fire. *Brown*, 624 N.E.2d at 1382. Later that day, petitioner and Brown confessed to planning arson to collect insurance and to setting the fire, respectively. *Id.* at 1383. Petitioner and Brown were sentenced to life in prison. Exh. 1 ¶ 3. On direct appeal, the state appellate court affirmed Brown's convictions and sentence but reversed petitioner's convictions and remanded for a new trial. *Id.*[2]

At petitioner's July 1994 retrial, the parties stipulated to the introduction of Cecil Hingston's and Sid Malone's testimony from the first trial, and their prior testimony was read to the jury. Exh. 1 ¶ 4. Hingston was working at a gas station near the video store on the morning of the fire, and around 5 a.m., two men in "a white Ford truck purchased gas in a red and yellow gasoline can." *Id.* One man "fumbled around" and spilled gas on the ground, while the other stayed in the truck, urging his companion to hurry. *Id.* The man who spilled the gas had a rag but asked for additional paper towels, which Hingston provided, and they left after paying. *Id.*

Malone was crossing East 63rd Street around 5 a.m. that morning when he noticed "a white van, with license plate number GAS 403, driving 'a little too fast,'

---

[2] As relevant here, petitioner also claimed on direct appeal after his first trial that his inculpatory statements at the police station were involuntary and coerced, and the appellate court rejected this claim. *See Brown*, 624 N.E.2d at 1382, 1391.

causing him to 'back up' and 'get out of the way.'" *Id.* ¶ 5. "[T]he van parked in front of a video store and a Chinese restaurant at the 400 block of 63rd Street," and Malone saw two people — one carrying a gasoline can — exit the van and walk toward the video store where two or three other people were standing. *Id.* A few minutes later, Malone noticed smoke coming from the store. *Id.*

Two Chicago police officers were on patrol when they saw smoke coming from the video store, and one officer began knocking on the storefront windows to see if anyone was inside. *Id.* ¶ 6. Petitioner approached the officer and asked whether the "Chinese or Oriental people" got out. *Id.* The officer advised petitioner to stand across the street and talk to the other officer, his partner; petitioner identified himself to the other officer as the store's owner and agreed to come to the station to assist in the investigation. *Id.*

When he was first interviewed at the police station, petitioner was not a suspect; he was not handcuffed or restrained in any way. *Id.* ¶ 10. Petitioner told the interviewing detective "that he [petitioner] owned a Ford van with license plate number GAS 403, and that he was the only person with keys to the van." *Id.* ¶ 10. The detective then advised petitioner of his *Miranda* rights. *Id.*

Meanwhile, Malone approached the second officer at the scene and told her that he had seen "two men exit a white van with license plate number GAS 403," and that one had carried a gasoline can into the video store. *Id.* ¶ 7. Malone then pointed to "a van driving down 63rd Street and said: 'There it goes now; there goes the van now.'" *Id.* She radioed to other officers in the area to stop the vehicle. *Id.*

When firefighters arrived, smoke was pouring out of the video store; the front door was locked with burglar bars. *Id.* ¶ 8. After breaking through the front door and extinguishing the fire, a fireman saw that the burglar bars had been pried off the store's back door, and he noticed that the store smelled of gasoline. *Id.* He then entered the adjoining restaurant and discovered two deceased victims whose noses and mouths were covered with soot. *Id.* They died from smoke inhalation. *Id.* ¶ 13.

According to experts, the fire had started in the back of the video store and gasoline was used as an accelerant. *Id.* ¶ 9; *see also Harper*, 665 N.E.2d at 480 (debris samples tested positive for gasoline residue). Outside the building, police found a two-gallon, red and yellow gasoline can with a white rag wrapped around the handle, and after obtaining a warrant, they searched a white Ford Bronco with license plate GAS 403 and recovered several videotapes. Exh. 1 ¶ 9. The license plate was registered to "Geronia Hopper." *Id.* ¶ 14.

After detectives advised petitioner of his *Miranda* rights, an Assistant State's Attorney (ASA) took a court-reported statement from petitioner. *Id.* ¶¶ 10-11. That statement was published to the jury. *Id.* ¶ 11. In it, petitioner claimed that his mother owned the video store, and that at 3 a.m. on the morning of the fire, he had driven there to meet Brown. *Id.* Petitioner told Brown that he wanted to burn the videotapes because the business was not profitable, and he wanted to collect the insurance proceeds. *Id.* Petitioner's uncle Albert Harper and cousin Geronia Ford were also present. *Id.* Brown agreed to assist petitioner in exchange for some X-rated videotapes, which he put in the Ford Bronco. *Id.* Then, petitioner told Ford to

get some gasoline, and Ford and Harper left, and petitioner and Brown remained at the store. *Id.* Brown bent the burglar bars at the back of the store to make it look like a break-in, and he and petitioner discussed putting a mattress against the videotapes so the fire "would flame quicker." *Id.* Petitioner admitted that he knew that two "Oriental persons" had a restaurant near the store, and that they sometimes spent the night in the restaurant; he also knew that their truck was in the neighborhood on the night of the fire. *Id.* Petitioner said that the police and ASA had treated him fairly. *Id.*

The building's landlord, who leased retail space to petitioner, carried liability insurance on the building but not fire insurance because the premium was too high. *Id.* ¶ 12. The landlord did not know if petitioner had insurance on the video store, nor did he know if petitioner received any insurance proceeds after the fire. *Id.* Petitioner had been "more or less" current on his rent, and if any rent was owed, it was only for one month. *Id.*

The jury found petitioner guilty of arson and two counts of first degree murder, and he was sentenced to natural life imprisonment on his murder convictions and a concurrent seven-year term on his arson conviction. *Id.* ¶ 15.[3] The state appellate court affirmed, *id.*, and on October 2, 1996, the state supreme court denied petitioner's petition for leave to appeal (PLA). *People v. Harper*, 671 N.E.2d 737 (Table) (Ill. 1996).

---

[3] Geronia Ford was also convicted of arson after a 1991 jury trial and sentenced to seven years, and Albert Harper was acquitted following a 1991 bench trial. *See* Exh. 1 ¶ 3 n.1.

## II. Following Postconviction Proceedings, Petitioner's Codefendant Brown Was Eventually Granted a Third Trial, Was Not Retried, and Obtained a Certificate of Innocence.

After the state appellate court affirmed codefendant Brown's convictions on direct appeal, Brown unsuccessfully sought state postconviction relief. *See* Exh. 2 (*People v. Brown*, 2015 WL 4512038, 2015 IL App (1st) 131293-U) ¶ 11.[4] Brown then filed a successive postconviction petition and was granted a new trial after a third-stage evidentiary hearing. *Id.*; *see also Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1143-44 (N.D. Ill. 2022) (Pallmeyer, J.) (explaining that Brown sought postconviction relief based on confession of fellow inmate James Bell).[5]

[4] Illinois postconviction review proceeds in three stages. *People v. Tate*, 980 N.E.2d 1100, 1103 (Ill. 2012). At the first stage, the trial court reviews the petition and determines, without the State's involvement, whether the petition should be summarily dismissed as frivolous or patently without merit. *Id.* If the petition is not summarily dismissed, it advances to the second stage, where counsel may be appointed, and the State responds. *Id.* at 1104; *see* 725 ILCS 5/122-5. At this second stage, the court determines whether the petition, assuming its factual allegations are true, makes a substantial showing of a constitutional violation. *Tate*, 980 N.E.2d at 1104. Any claims that survive second-stage dismissal advance to the third stage, where the trial court conducts an evidentiary hearing to determine whether the petitioner is entitled to postconviction relief. *Id.*

[5] Respondent cites the decision in Brown's civil lawsuit against the City of Chicago for additional context regarding Brown's case insofar as it relates to petitioner's. This Court may take judicial notice of the procedural history of Brown's criminal case as recounted by the Court in its opinion resolving the defendants' motion for summary judgment because those facts were not disputed at summary judgment, and they are derived from publicly available sources (state court records) whose accuracy cannot be reasonably questioned. *See Carter v. Sturgeon*, 643 F. Supp. 862, 865 (N.D. Ind. 2022) (citing Fed. R. Evid. 201). In any event, resolution of petitioner's successive habeas petition does not rely on the truth of the facts asserted in Brown's civil case.

### A. Brown was reconvicted on retrial, despite James Bell claiming sole responsibility for the arson.

Brown was retried in 2008, where the same State witnesses testified as in his original 1990 trial (Malone's and Hingston's prior testimony was admitted by stipulation because both had since died). Exh. 2 ¶ 12. During Brown's retrial, however, the investigating detectives changed their testimony: "Detective Campbell did not expressly testify (as he had in the first trial) that he recovered the gasoline can before [Brown] mentioned the can," while "Detective Fine now [at retrial] expressly testified that [Brown] gave his inculpatory statement mentioning the gasoline can before Detective Campbell returned to the scene to recover it." *Id.*

Brown did not testify at his retrial as he had at the first trial; instead, the defense relied on the testimony of James Bell, who was serving a life sentence for armed robbery. *Id.* Bell testified that Brown owed him money for drugs and that, believing that Brown owned the video store, Bell set fire to the store after breaking in and finding only a few dollars. *Id.* Bell claimed that he had bent the burglar bars and kicked in the locked back door. *Id.*

The jury again found Brown guilty of arson and two counts of first degree murder, and the court again sentenced him to natural life imprisonment on the murder counts. *Id.* The state appellate court affirmed. *See id.* ¶ 13.

### B. The state postconviction court granted Brown a third trial, and the State dismissed the charges.

Brown then filed a pro se postconviction petition alleging that at his retrial, the State had presented false testimony from Detectives Fine and Campbell — that Brown told police where to find the gasoline can used in the arson — when, in the

original trial, these witnesses had testified (and the State argued) that the can was found using information learned from petitioner. *Id.* ¶ 14. Brown also claimed that trial counsel was ineffective for not presenting Hingston's 2002 affidavit recanting his original trial testimony. *Id.* In that affidavit, Hingston stated that he had repeatedly denied selling gasoline to men in a van or truck on the morning in question, but that police told him that he would be reported to his employer and fined for not documenting the alleged sale. *Id.* Brown also relied on petitioner's 2012 affidavit, which stated that he and Brown did not meet at the police station before Brown gave his inculpatory statement. *Id.*

The state postconviction court summarily dismissed Brown's postconviction petition, but the state appellate court reversed. *Id.* ¶¶ 15-22. Following the appellate court's separate but related ruling in petitioner's parallel postconviction proceedings,[6] the State conceded that Brown had made a substantial showing that his trial counsel was ineffective for not presenting Hingston's affidavit. *Id.* ¶ 20. The appellate court thus held that it was "at least arguable that not introducing Hingston's affidavit constituted ineffective assistance of counsel," vacated the judgment of dismissal, and remanded for further proceedings. *Id.* ¶ 21.

On remand, Brown filed an amended postconviction petition in 2016, and in October 2017, the postconviction court ruled that the prosecutor committed

---

[6] In that ruling, the appellate court had held that Bell's testimony and Hingston's recantation "constituted newly discovered evidence of actual innocence" as to petitioner, but that "the reliability of Hingston's affidavit should not be determined at this stage of the proceeding," that is, before an evidentiary hearing. Exh. 2 ¶ 16.

misconduct at Brown's 2008 retrial. *See Brown*, 633 F. Supp. 3d at 1145. Specifically, "[t]he prosecutor had argued in closing that Mr. Brown's confession led detectives to discover a gas can in the alley behind Magic Video," which "was false," because "[i]n a police report . . . , Campbell stated the gas can was discovered by an individual named William Henry Lewis at approximately 3 p.m., before Mr. Brown was in custody." *Id.* (citing *People v. Brown*, No. 88 CR 8605, Order Granting New Trial, Ex. 53 [CM/ECF 302-53] at 16). The postconviction court then concluded that Brown's appellate counsel was ineffective for failing to raise prosecutorial misconduct on appeal and, accordingly, vacated Brown's convictions. *Id.* The State filed a notice of appeal but ultimately decided neither to pursue the appeal nor to retry Brown. *See id.* at 1145-46 (discussing State's attorneys' decision-making regarding the feasibility of retrial 30 years after the fire and considering the "interests of justice"). In November 2017, the State withdrew its notice of appeal and dismissed all charges against Brown. *Id.* at 1146.

The following month, Brown petitioned the state court for a Certificate of Innocence (COI), *see* 735 ILCS 5/2-702(g) (civil process in which petitioner must prove "by a preponderance of evidence" that (1) he was convicted of a felony, which judgment was (2) reversed or vacated and the charge(s) dismissed, and that he (3) is innocent of the charge(s), and (4) did not bring about his conviction). The State took no position on Brown's petition. *See Brown*, 633 F. Supp. 3d at 1146 (discussing State attorneys' decision-making regarding Brown's COI petition). The court then granted the uncontested COI. *Id.* at 1146-47. Brown later received a settlement

from the City of Chicago in his federal wrongful-conviction lawsuit. *See Brown v. City of Chicago*, No. 18 C 7064 (N.D. Ill. June 26, 2023) (agreed dismissal).

## III. Petitioner Lost All State and Federal Postconviction Challenges.

### A. The state courts denied petitioner's initial and successive postconviction challenges to his 1994 convictions.

In March 1997, petitioner filed a counseled state postconviction petition claiming, as relevant here, that prosecutors committed misconduct by making improper closing argument, and that he was actually innocent of the crimes based upon the confession of a "James Dell." Exh. 3 (Postconviction Pet. & Trial Court Order Dismissing Pet., *People v. Harper*, No. 88 CR 8605 (Cook Cnty. Cir. Ct. Mar. 31, 1997)) at 2. Petitioner failed to attach any affidavits or supporting documentation to the petition. *See* Exh. 1 ¶ 16. While that petition was pending, petitioner filed a pro se postconviction petition, in which he alleged that a new eyewitness, Willie Freeman, would prove his actual innocence. *See* Exh. 4 (Pet. for Postconviction Relief & Trial Court Order Dismissing Pet., *People v. Harper*, No. 88 CR 8605 (Cook Cnty. Cir. Ct. May 16, 1997)) at 7. He also alleged, as relevant here, that the prosecutor made improper closing arguments, *id.* at 13, and that counsel provided ineffective assistance by failing to object to the prosecutor's improper comments, *id.* at 9. The trial court summarily dismissed both the counseled and pro se petitions, *see* Exh. 3 at 5-12; Exh. 4 at 18-21, and the state appellate court affirmed in separate unpublished summary orders, Exh. 1 ¶ 16 (citing Rule 23 Order, *People v. Harper*, No. 1-97-3735 (Ill. App. Ct. Dec. 29, 1998) & Rule 23 Order, *People v. Harper*, No. 1-97-3023 (Ill. App. Ct. Mar. 30, 1999)).

**B. This Court denied petitioner's initial federal habeas petition.**

In January 2000, petitioner filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus, alleging that the state trial court had erred by refusing to instruct the jury on involuntary manslaughter and by admitting a photograph of the gasoline can into evidence. *Harper v. Welborn*, No. 00 C 0061, 2000 WL 656678, at *1-2 (N.D. Ill. Apr. 18, 2000). This Court (Judge Holderman presiding) denied habeas relief, finding that the first claim was meritless and the second presented only a non-cognizable issue of state law. *See id.* at *3-4.

**C. The state courts denied petitioner's actual-innocence claim after an evidentiary hearing.**

After this Court denied petitioner's first federal habeas petition, in July 2001, petitioner filed his second successive collateral challenge in state court: a pro se motion to vacate his sentence, arguing that the sentence was unconstitutional and void under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Exh. 1 ¶ 17. The appellate court affirmed the trial court's dismissal of the motion. *Id.*

In January 2003, petitioner filed another pro se successive postconviction petition, again claiming actual innocence. *Id.* ¶ 18. The state postconviction court appointed counsel, who filed an amended petition in 2009, which asserted actual innocence based on newly discovered evidence, including: (1) James Bell's confession to the crime for which petitioner was convicted — supported by Bell's 2009 affidavit and a transcript of Bell's testimony in Brown's postconviction proceedings — and (2) Hingston's December 2002 affidavit recanting his trial testimony. *Id.* ¶¶ 18-19; *see also* Exh. 5 (Amended Petition for Postconviction

Relief, *People v. Harper*, No. 88 CR 8605 (Cook Cnty. Cir. Ct. July 28, 2009)) at 18-19 (Bell's affidavit), 20-57 (Bell's testimony at Brown's evidentiary hearing), 58-59 (Hingston's affidavit). Petitioner also supported his amended petition with his own 2009 affidavit averring that he confessed to setting the fire only because police threatened to charge his mother, who co-owned the video store, with murder. Exh. 1 ¶ 20; *see also* Exh. 5 at 14-17 (petitioner's affidavit). He stated that he did not know Bell before the fire and that, in 1997, while incarcerated at the Stateville Correctional Center, he heard a "rumor" about "James Dell" who was also at Stateville but had never spoken with him. Exh. 1 ¶ 20. Petitioner also asserted that he did not set fire to the video store and never asked anyone to buy gasoline to start a fire, nor did he or his mother collect any insurance money. *Id.*

The state court dismissed the petition in July 2010, but the state appellate court reversed and remanded for a third-stage evidentiary hearing. *Id.* ¶ 21; *see also People v. Harper*, 987 N.E.2d 954, 971 (Ill. App. Ct. 2013).

### 1. After an evidentiary hearing, the state postconviction court found petitioner's witnesses were not credible and denied relief.

At the June 2015 evidentiary hearing, Bell testified that he was incarcerated at the Stateville Correctional Center, serving a life sentence for armed robbery and had been incarcerated for 20 years. Exh. 1 ¶ 25; *see also* Exh. 6 (Report of Proceedings, *People v. Harper*, No. 88 CR 8605 (Cook Cnty. Cir. Ct.)) at 22-51. Bell claimed that, in 1988, he sold cocaine and heroin, and Brown had accrued a $3,000 drug debt. Exh. 1 ¶ 25. When Bell confronted Brown about the debt, Brown claimed that his video store business was having difficulty, but he promised to pay

Bell as soon as "he start[ed] making money." *Id.* Bell eventually "got tired" of waiting for Brown to pay his debt and decided to set the video store on fire. *Id.*

Specifically, Bell testified, he drove his brown Audi 5000 to the video store sometime between 2 and 4 a.m. on the morning of the fire and parked behind the store. *Id.* ¶ 26. He retrieved a gasoline can from his car and approached the video store's back door from the alley. *Id.* Bell recalled that the store had "cheap" burglar bars that did not "go all the way down to the ground" so he was able to slide under the bars. *Id.* He also stated that there was "nothing sophisticated" about the rear door, which "popped" open after he pushed "real hard." *Id.* He entered the store with the gasoline can and searched for money near the cash register; finding none, he "sprinkled" gas around several rows of videotapes and a mattress near the rear of the store. *Id.* He ignited the gas with a lighter, left through the store's back door, slid under the burglar bars, "dumped" the gasoline can behind the store, and "got out of there." *Id.*

Bell explained that he waited "10 or 15 years" to come forward because it took time for the effects of drugs to dissipate and his "common sense" to return. *Id.* ¶ 27. He stated that he first talked about his culpability in a prison Bible study group, which made him feel "relieved." *Id.* Bell stated that he never told anyone outside of prison what happened; he never read transcripts from petitioner's or Brown's trials; and he knew nothing about their cases. *Id.* He denied that anyone offered him anything in exchange for his testimony, and he denied testifying in postconviction cases other than Brown's and petitioner's. *Id.* Bell also

acknowledged his numerous armed robbery convictions and that he was serving two life sentences in the same prison where Brown was housed. *Id.* ¶ 28. He admitted that he was never convicted of any drug crimes, and he affirmed that the affidavit in which he confessed to arson was prepared by investigators working for Brown, and that he had signed it. *Id.*

Petitioner testified that he and his mother were co-owners of the video store and that Brown worked there as a handyman. *Id.* ¶ 29; *see also* Exh. 6 at 52-71, 79-105 (evidentiary hearing testimony). He claimed that, at 12:30 a.m. on the day of the fire, he met Brown at the store and asked him to install some shelves. Exh. 1 ¶ 29. Petitioner's cousin and uncle (Ford and Harper) were also present. *Id.* Around 1 a.m., petitioner, Ford, and Harper left Brown working in the store, and Harper went to the corner store to drink with friends while petitioner drove Ford to their grandmother's house, where they went to sleep. *Id.* Petitioner stated that his grandmother woke him up because his pager kept going off, and after returning the page, he learned that the store was on fire. *Id.* He walked to the store, approached a police officer at the scene, and informed him that Brown was inside the store. *Id.* Petitioner complied with the officer's request to step away from the building, and he agreed to go to the police station to assist in the investigation. *Id.* Petitioner acknowledged that he signed a court-reported statement drafted by two detectives and the ASA but asserted that investigators never asked him any questions before he signed the statement. *Id.*

Petitioner further testified that neither he nor his mother had insurance on the store or the videotapes, nor did they collect insurance money from the fire. *Id.* ¶ 30. Regarding Bell, petitioner testified that he first became aware of him in 2004 or 2005 when petitioner was in Tamms Correctional Center. *Id.* He did not know Bell in 1988, never saw him in the neighborhood, never talked to him, and never offered him anything in exchange for his testimony in this case. *Id.* Petitioner denied setting fire to the video store. *Id.* On cross-examination, he admitted that in 1988 he drove a white Ford Bronco with license plate GAS 403, which was registered to his uncle, Geronia Hopper; petitioner drove it to Magic Video the night before the fire. *Id.*; *see also* Exh. 6 at 59-60. He also conceded that two boxes of pornographic videotapes were inside his vehicle. Exh. 1 ¶ 30. He explained that he was going to trade the videotapes with Ed's Video on 79th and Western. *Id.*

Hingston had died during the pendency of proceedings and so did not testify. *Id.* ¶ 25. After the defense rested, the State called ASA Whitehouse as a witness. *Id.* ¶ 32; *see also* Exh. 6 at 108-51. Whitehouse worked in the felony review unit in the Cook County State's Attorney's Office and assisted in investigating the fire. Exh. 1 ¶ 32. He explained that there were four suspects, and police were looking for "a white van or truck with license plate number GAS 403." *Id.* After locating the vehicle, Whitehouse obtained a warrant and accompanied police as they searched it; they recovered two boxes and a plastic bag containing pornographic videos. *Id.*

When he returned to the police station the same morning, Whitehouse learned that petitioner and Ford were in custody. *Id.* ¶ 33. A third suspect —

Brown — arrived later in the evening, while the fourth suspect — Albert Harper — came a few days later with an attorney. *Id.* Whitehouse testified that petitioner, Ford, and Brown each confessed to playing a role in the arson, but that it took several hours to take their statements because he had to wait for a court reporter. *Id.* He then obtained "court-reported" confessions from petitioner and Ford; Brown gave a handwritten confession because he did not want to wait for the court reporter. *Id.* Whitehouse testified that all three confessions were given "quickly" and, although the stories were not exactly the same, they "dovetailed and fit" together with the sequence of events. *Id.* He had "no doubt" that the statements he obtained were accurate and denied that anyone was mistreated or otherwise coerced into confessing. *Id.*

After closing arguments, the postconviction court denied relief. *Id.* ¶ 34; *see also* Exh. 6 at 170-73. The court explained that it found Whitehouse credible and his testimony compelling as to the lack of any coercion employed on petitioner. Exh. 1 ¶ 34. It observed that "[t]his might be one of the fastest confessions in the history of double murders in Chicago" and there was "not enough time to employ any coercion," and therefore concluded that petitioner gave a "free and voluntary" truthful admission about his role in the crimes. *Id.* The court also found Hingston's recantation in his 2002 affidavit not credible and inherently unreliable. *Id.* Regarding Bell, the court found his testimony "totally unbelievable" and that he had "zero credibility." *Id.* The court noted that Bell was serving two terms of life imprisonment and was not at risk of obtaining a longer prison sentence or the death

penalty for confessing to the arson. *Id.* Given that he had nothing to lose, the court stated that "Bell doesn't factor into this case at all" and denied relief. *Id.*

**2. The state appellate court affirmed the denial of postconviction relief.**

On appeal, petitioner argued that the postconviction court had erred by denying his claim of innocence. *Id.* ¶ 35. The appellate court disagreed and, deferring to the postconviction court's credibility determinations, held that petitioner's new evidence was not so conclusive that it would probably change the result on retrial. *See id.* ¶¶ 41-52.

The appellate court observed that "[u]ltimately, [petitioner's] postconviction petition turned on the credibility of Bell's confession and Hingston's recantation," and that it was the postconviction court's role "to assess the credibility of the testimony after having observed the demeanor of the witnesses." *Id.* ¶ 52. Because the court "properly considered the record, listened to all of the testimony, and watched how the witnesses reacted when questioned and cross-examined," the appellate court "[could] not say that the [postconviction] court committed a clearly evident, plain, or indisputable error in finding that Bell's testimony and Hingston's recantation affidavit were not credible and, therefore, not of such a conclusive character that the result on retrial would be different." *Id.*

Accordingly, the postconviction court's denial of postconviction relief was not manifestly erroneous, *id.*, and the appellate court affirmed, *id.* ¶ 58. On September 27, 2017, the state supreme court denied petitioner's ensuing PLA. *See People v. Harper*, 89 N.E.3d 759 (Table) (Ill. 2017).

## IV. Petitioner's Successive Federal Habeas Petition

In June 2025, petitioner purported to file in this Court a successive § 2254 petition challenging his 1994 convictions. Doc. 1. Liberally construed, the successive petition alleges that:

(1) prosecutors committed misconduct during petitioner's 1994 retrial by (a) making improper closing arguments, Doc. 9 at 6, 16-17, and (b) introducing petitioner's coerced confession, *id.* at 7, 17;

(2) police and prosecutors coerced petitioner's confession, *id.* at 18-19;

(3) trial counsel was ineffective for failing to preserve petitioner's prosecutorial-misconduct claims for appeal, *id.* at 6, 19; and

(4) petitioner is actually innocent, based on Bell's confession, Hingston's recantation, and petitioner's own testimony, *id.* at 8-11, as well as subsequent developments in Brown's case, *id.* at 11-13.

This Court (Judge Lawless presiding) found that it lacked subject matter jurisdiction over the successive petition, dismissed the petition without prejudice, and forwarded it to the United States Court of Appeals for the Seventh Circuit for consideration under § 2244(b)(3) in the first instance. Doc. 6.

The Seventh Circuit reviewed the petition and noted that it lacked access to the state-court records in Brown's and Harper's cases. Doc. 7 at 2. Yet, it found, "Brown's exoneration and the cited evidence of witness recantations at least at this stage lend weight to Harper's claim that certain confessions and trial testimony were the product of unconstitutional police or prosecutorial tactics." *Id.* The Seventh Circuit thus determined that, based on the limited records available at that stage of review and with only 30 days to consider petitioner's application, petitioner's successive habeas petition made a "prima facie showing" of innocence

under § 2244(b)(2)(B), and granted petitioner leave to proceed in the district court. *Id.*; *see* 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section."). The Seventh Circuit expressed no view on the merits of petitioner's underlying claims, nor whether his claims "go beyond a prima facie showing and meet § 2244(b)(2)'s high standard for a successive collateral attack." Doc. 7 at 2. The successive petition was refiled, Doc. 9, and transferred to this Court, Doc. 10.

## ARGUMENT

### I. Petitioner's Successive Habeas Petition Is Barred.

This Court should dismiss petitioner's successive habeas petition with prejudice because the factual predicates for the federal constitutional claims he seeks to raise (Claims 1 through 3) were known at the time of his 1994 retrial and therefore available to him when he filed his initial habeas petition in January 2000. Furthermore, petitioner's freestanding claim of actual innocence (Claim 4) is statutorily barred in a successive habeas petition because he alleges no constitutional error in connection with the facts underlying that claim.

Petitioner cannot satisfy the high standard under § 2244(b)(2) for this Court to entertain the new challenges to his 1994 convictions that he raises in his successive habeas petition. "Habeas petitioners are generally entitled to 'one fair opportunity' to litigate the merits of their postconviction claims in federal court." *Rivers v. Guerrero*, 605 U.S. 443, 450 (2025) (quoting *Banister v. Davis*, 590 U.S. 504, 507 (2020)). But "[w]hen a person seeks to bring a subsequent federal habeas

challenge to his detention, 'the road gets rockier.'" *Id.* (quoting *Banister*, 590 U.S. at 509). Sections 2244(b)(1) and (b)(2) impose "significant procedural barriers that strictly limit a court's ability to hear 'claim[s] presented' in any 'second or successive habeas corpus application.'" *Id.* (quoting 28 U.S. §§ 2244(b)(1), (2)).

New claims presented in a successive habeas petition must fall within one of two narrow categories to proceed: The claim must either (A) rely on a new and retroactive rule of constitutional law, 28 U.S.C. § 2244(b)(1)(A), or (B) be based on a factual predicate that "could not have been discovered previously through the exercise of due diligence" *and* "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense," *id.* § 2244(b)(2)(B)(i)-(ii). If not, the claim "shall be dismissed." *Id.* § 2244(b)(2). After a court of appeals determines that a petitioner has made a "prima facie showing" that the petition satisfies one of § 2244(b)(2)'s exceptions and grants authorization under § 2244(b)(3) to proceed, "the district court must independently confirm that the petition satisfies the requirements of § 2244(b)(2)." *Rivers*, 605 U.S. at 450 (citing 28 U.S.C. § 2244(b)(4)).

Petitioner does not raise a claim based on a new and retroactive constitutional rule, so he cannot satisfy § 2244(b)(2)(A).

Nor can he satisfy § 2244(b)(2)(B). Petitioner *raised* the underlying factual predicates for his federal constitutional claims (Claims 1 through 3) in state court

years before he filed his initial federal habeas petition, so he cannot show that he could not have discovered those factual predicates earlier, as required under § 2244(b)(2)(B)(i).

Moreover, because the Supreme Court has not recognized actual innocence as a freestanding federal constitutional claim, *see Dixon v. Williams*, 93 F.4th 394, 406 (7th Cir. 2024), and because new evidence of innocence that stands apart from any constitutional error at trial necessarily cannot satisfy § 2244(b)(2)(B)(ii), petitioner's actual-innocence claim (Claim 4) must also be dismissed. *See* 28 U.S.C. § 2244(b)(2)(B)(ii) (requiring that "*but for constitutional error*," the "facts underlying the claim" must "be sufficient to establish by clear and convincing evidence" that no reasonable juror would have convicted petitioner) (emphasis added); *see also Houston v. Tanner*, 160 F.4th 683, 690-91 (5th Cir. 2025) (noting same); *Charboneau v. Davis*, 87 F.4th 443, 453-54 (9th Cir. 2023) (same).

**A. Petitioner's constitutional claims (Claims 1 through 3) are barred because petitioner knew their factual predicates when he filed his initial habeas petition.**

Petitioner raises new federal constitutional claims (Claims 1 through 3) that were not raised in his initial petition, *compare* Doc. 9 at 16-20 (alleging claims of prosecutorial misconduct and ineffective assistance of trial counsel) *with Harper*, 2000 WL 656678, at *1-2 (alleging jury instruction and evidentiary errors), but none rely on factual predicates that "could not have been discovered previously through the exercise of due diligence" as required to satisfy § 2244(b)(2)(B)(i). Rather, petitioner's claims rely entirely on facts known to him at the time of his 1994 retrial — i.e., the circumstances of his inculpatory statements to police and ASA

Whitehouse at the police station on the day of the fire, his statements' introduction at trial, the prosecutor's comments during closing argument, and his trial counsel's failure to object to those comments. *See* Doc. 9 at 16-20. Indeed, he raised these claims in his first direct appeal in 1993, *see Brown*, 624 N.E.2d at 1382, 1391, and/or in his state postconviction petitions in 1997, *see* Exh. 3 at 2; Exh. 4 at 9.

Despite indisputably knowing their factual predicates years before he filed his initial § 2254 petition in 2000, petitioner failed to raise these claims before the habeas court at that time. *See Harper*, 2000 WL 656678, at *1-2. Accordingly, he may not raise them now. *See, e.g.*, *Altman v. Benik*, 337 F.3d 764, 767 (7th Cir. 2003) (new claim presented in successive habeas petition premised on trial counsel's conflict of interest did not satisfy § 2244(b)(2) because it neither relied on new, retroactive constitutional rule nor on previously unavailable evidence); *see also Engesser v. Dooley*, 686 F.3d 928, 937 (8th Cir. 2012) (factual predicate for ineffective-assistance claim raised in successive habeas petition was available at time of trial and so did not satisfy § 2244(b)(2)(B)(i)); *In re Lambrix*, 624 F.3d 1355, 1366 (11th Cir. 2010) (petitioner failed to show that factual predicate for prosecutorial-misconduct claim presented in successive habeas petition could not have been discovered previously). Accordingly, he fails to satisfy § 2244(b)(2)(i), so these claims must be dismissed.

### B. Petitioner's actual-innocence claim (Claim 4) is not cognizable as a freestanding claim and barred by statute.

Petitioner's freestanding actual-innocence claim is not a cognizable federal constitutional claim. The Supreme Court has never held that a claim of actual

innocence, standing alone, could support federal habeas relief in an initial petition. *See Dixon*, 93 F.4th at 406; *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). Thus, the Seventh Circuit has thus far declined to recognize such a claim. *Dixon*, 93 F.4th at 406-07; *see also Cal v. Garnett*, 991 F.3d 843, 851 (7th Cir. 2021) (collecting cases).

Nor has the Supreme Court held that a substantive claim of innocence — even were it cognizable in an initial petition — can be brought in a second or successive petition. *See Lambrix*, 624 F.3d at 1367. Indeed, the plain text of the habeas statute precludes such a claim. Under § 2244(b)(2)(B)(ii), a petitioner may present a new claim in a successive petition only when the facts underlying that claim "would be sufficient to establish . . . that, *but for constitutional error*, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added). Where a substantive claim of innocence based on newly discovered evidence stands apart from any claim of constitutional error arising at trial, a petitioner necessarily cannot establish that the facts underlying his claim would have resulted in a different outcome at trial "*but for constitutional error*." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added); *see also Houston*, 160 F.4th at 690-91 (accepting parties' understanding that petitioner's new evidence of innocence in successive petition must be "'rooted in constitutional error[ ] occurring during trial'" to satisfy § 2244(b)(2)(B)(ii)) (quoting *Case v. Hatch*, 731 F.3d 1015, 1038 (10th Cir. 2013)); *Charboneau*, 87 F.4th at 454 (agreeing with *Case* that "the statutory language unambiguously requires a nexus

between the new factual predicate underlying the constitutional claim and the showing of actual innocence," and that evidence of innocence unconnected with any constitutional error fails to satisfy § 2244(b)(2)(B)(ii)). Accordingly, a substantive claim of innocence — unconnected to any constitutional error at trial — cannot be raised in a successive habeas petition. Put differently, new evidence of innocence, on its own, cannot support habeas relief in a successive petition.

Here, petitioner's claim of innocence (Claim 4) relies on the "new" factual predicates of Bell's confession, Hingston's recantation, and subsequent developments in Brown's case. *See* Doc. 9 at 8-13.[7] But petitioner fails to connect this more recently discovered evidence with any claim of constitutional error at his trial. First, Bell's confession is unconnected to any of the constitutional claims that petitioner alleges in his successive habeas petition. That is, Bell's admission several years after petitioner's trial that he (Bell) set the fire has no bearing on the circumstances of petitioner's statements to police and prosecutors, the prosecutor's closing arguments, or petitioner's trial counsel's failure to object to those comments or to the admission of petitioner's confession. *See* Doc. 9 at 6-7, 16-19. Nor does Bell's confession support any other claim of constitutional error occurring at

---

[7] These factual predicates were not discoverable prior to petitioner's initial habeas petition in 2000: Bell first confessed in 2001 to setting the fire, *Brown*, 633 F. Supp. 3d at 1143; Hingston recanted his trial testimony in 2002, *id.* at 1144; and Brown obtained his COI in February 2018, *id.* at 1147. Petitioner, however, waited until June 2025 to raise any of this evidence in a successive habeas petition. Doc. 1. Accordingly, petitioner also fails to show that these factual predicates "could not have been discovered previously," that is, before June 2025, "through the exercise of due diligence," so as to satisfy 28 U.S.C. § 2244(b)(2)(B)(i).

petitioner's trial, as petitioner fails to allege — and the record does not support — that petitioner's trial counsel was ineffective for failing to discover Bell and present his testimony at petitioner's 1994 trial, or that the prosecution was aware of Bell's admissions before petitioner's trial. *See id.* at 8-13. Bell said nothing about the fire until "10 or 15 years" later, after he was incarcerated on unrelated offenses. *See* Exh. 1 ¶ 27. This new evidence therefore fails to satisfy § 2244(b)(2)(B)(ii). *See Houston*, 160 F.4th at 692 (new witnesses' affidavits fail to satisfy § 2244(b)(2)(B)(ii) where they do not connect with any claim of constitutional error).

Likewise, Hingston's 2002 affidavit recanting his 1990 trial testimony (and read into the record at the 1994 trial) is not connected to any constitutional error occurring at petitioner's 1994 trial. Petitioner's successive petition both fails to allege that prosecutors knowingly presented Hingston's perjured testimony and fails to connect petitioner's allegations that his own confession was coerced with Hingston's allegations that police coerced him into falsely testifying that he sold gasoline to two men in a white truck the morning of the fire. *See* Doc. 9 at 6-9 (discussing Hingston's recantation but not alleging that prosecutors knowingly introduced Hingston's false testimony), 17 (alleging prosecutorial misconduct solely on basis of introduction of petitioner's involuntary confession), 18 (alleging police misconduct solely in connection with petitioner's confession). Accordingly, Hingston's recantation is also not rooted in constitutional error at petitioner's trial, so it cannot satisfy § 2244(b)(2)(B)(ii). *See Houston*, 160 F.4th at 692.

To the extent that petitioner's successive petition could be liberally construed to allege that police threatened Hingston to testify falsely, and that prosecutors then suborned perjury by knowingly presenting Hingston's false testimony, this constitutional claim would fail to satisfy § 2244(b)(2)(B)(ii). Hingston's affidavit — even were it credible (contrary to the postconviction court's finding that it was not *see* Exh. 1 ¶ 43; Exh. 6 at 172) — does not clearly and convincingly establish petitioner's innocence such that, but for the constitutional error (i.e., Hingston's perjured testimony), no reasonable juror could have convicted petitioner in light of the evidence as a whole. *See* 28 U.S.C. § 2244(b)(2)(B)(ii); *see also Houston*, 160 F.4th at 692-94 (claim fails to satisfy § 2244(b)(2)(B)(ii) when reasonable factfinder could believe inculpatory evidence was more persuasive than new, credible, exculpatory evidence). As the state appellate court found, Hingston was not an eyewitness to the fire and never identified at trial the men who purchased gas from him, much less did he testify that petitioner was involved. *See* Exh. 1 ¶¶ 43-46. Hingston's affidavit attests that he went to the police station and identified two men in a physical lineup after police threatened him, but "this [identification] evidence was never presented at [petitioner's] trial and was never considered by the trier of fact." *Id.* ¶ 46. Accordingly, "Hingston's affidavit is not a 'recantation' of any identification testimony presented at [petitioner's] trial," *id.*, and so cannot constitute a "trustworthy eyewitness account[ ]" sufficient to exonerate petitioner, *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Moreover, "to the extent [petitioner] argues that Hingston's affidavit buttresses his claim that [petitioner's] confession was the product of police coercion," the state postconviction court "specifically found that ASA Whitehouse's testimony that there was no coercion to be credible and compelling," Exh. 1 ¶ 47, and Hingston's affidavit "inherently unreliable," *id.* at ¶ 43. Petitioner fails to rebut these credibility determinations with clear and convincing evidence to the contrary, so this Court must defer to that finding on habeas review. *See* 28 U.S.C. § 2254(e)(1); *Cal*, 991 F.3d at 849-50 (according presumption of correctness to state court's finding that witness's testimony in support of innocence claim was not credible); *Kirkman v. Thompson*, 958 F.3d 663, 665 (7th Cir. 2020) (same as to state courts' determination that witness's affidavit recanting his trial testimony was unreliable). Therefore, even assuming that Hingston's affidavit indirectly supports petitioner's claim that his own confession was involuntary, it fails to establish petitioner's innocence under § 2244(b)(2)(B)(ii)'s "clear and convincing" standard.

Finally, the constitutional defects that occurred in Brown's retrial — which ultimately resulted in Brown being granted a third trial, the State's decision not to retry him, and Brown's subsequent uncontested COI application, *see Brown*, 633 F. Supp. 3d at 1145-46 — lack any connection to the constitutional errors that petitioner alleges occurred at his own 1994 retrial, *see* Doc. 9 at 11-13 (noting Brown was granted third trial after prosecutorial misconduct and ineffective assistance of appellate counsel stemming from Brown's 2008 retrial, subsequent dismissal of charges against Brown, and Brown's COI based on constitutional

defects in 2008 retrial and Brown's 1990 trial testimony). That prosecutors falsely argued that *Brown's* confession led to the discovery of the gasoline can, when the can was actually discovered before Brown was in custody, and that *Brown's* appellate counsel was ineffective for failing to raise prosecutorial misconduct on direct appeal, *see Brown*, 633 F. Supp. 3d at 1145, have no bearing on petitioner's claims that *his own* confession was coerced, prosecutors made improper closing arguments in *his* 1994 retrial, or *his* trial counsel failed to preserve these claims for appeal. Accordingly, the developments in Brown's case are unconnected to any constitutional error occurring at petitioner's trial and so also fail to satisfy § 2244(b)(2)(B)(ii). *See Houston*, 160 F.3d at 692.

Nor can petitioner demonstrate actual innocence merely because Brown obtained a COI. Indeed, that finding is consistent with evidence that petitioner falsely named Brown as an accomplice to shift the blame from himself, which led to Brown's arrest and false confession. At Brown's retrial, Detective Fine testified that petitioner "assisted in [Brown's] arrest and that [Brown] insisted upon meeting [petitioner] upon being confronted with alleged inculpatory statements by [petitioner]," and that "after defendants met, [Brown] gave an inculpatory statement." Exh. 2 ¶ 6. Indeed, nothing other than *petitioner's* statements to police on the day of the fire independently connected Brown with the arson because police did not learn about the gasoline can from Brown. *Id.* ¶ 6. Accordingly, Brown's legal innocence does not compel the conclusion that petitioner must be factually innocent.

*  *  *

In sum, the factual predicates underlying petitioner's federal constitutional claims were known to him when he filed his initial habeas petition, and the more recently discovered evidence supporting petitioner's claim of innocence is unconnected with any claim of constitutional error occurring at petitioner's trial. Accordingly, petitioner's successive habeas petition fails to satisfy § 2244(b)(2)(B) and must be denied. *See* 28 U.S.C. § 2244(b)(2).

**II. No Certificate of Appealability Should Issue.**

Upon entering an order denying habeas relief, this Court should also decline to issue a certificate of appealability (COA). *See* Habeas Rule 11(a). To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where the district court denies a habeas petition on procedural grounds without reaching the merits of the applicant's underlying constitutional claims, a COA should issue "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because it is not debatable that petitioner fails to satisfy the statutory requirements to allow the Court to proceed on the claims raised in his successive habeas petition, and that petitioner has failed to make a substantial showing of the denial of a constitutional right, this Court should decline to issue a COA.

## CONCLUSION

For these reasons, this Court should dismiss petitioner's successive habeas petition with prejudice as barred under 28 U.S.C. § 2244(b)(2) and decline to issue a COA. Should this Court find that 28 U.S.C. § 2244(b)(2) does not bar the petition, respondent requests 60 days from the date of this Court's order to address its claims.

September 21, 2026

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By: /s/ Lauren E. Schneider
LAUREN E. SCHNEIDER, Bar No. 6342598
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(773) 505-5275
lauren.schneider@ilag.gov

## CERTIFICATE OF SERVICE

I certify that on September 21, 2026, I electronically filed the foregoing **Motion to Dismiss Successive Habeas Petition** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, and on the same date arranged for a copy of this document to be mailed via the United States Postal Service to the following non-CM/ECF user:

Michael Harper, B03541
Western Illinois Correctional Center
2500 Route 99 South
Mount Sterling, IL 62353

/s/ Lauren E. Schneider
LAUREN E. SCHNEIDER, Bar No. 6342598
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(773) 505-5275
Lauren.Schneider@ilag.gov

*Counsel for Respondent*